UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

HERBERT E. ROBERTSON,

    Plaintiff,

    v.

                  CAUSE NO. 3:22cv887 DRL-AZ

NANCY MARTHAKIS,

    Defendant.

<u>OPINION AND ORDER</u>

Herbert E. Robertson, a prisoner at Indiana State Prison, sues Dr. Nancy Marthakis and alleges she acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment.[1] He says she delayed seeking care from outside specialists, gave inadequate pain management, and refused to provide medical accommodations. He hitches a Fourteenth Amendment claim for not providing enough information before prescribing Dilantin. Dr. Marthakis requests summary judgment on all claims. The court grants it.

BACKGROUND

Dr. Marthakis serves as the medical director at ISP in Michigan City, Indiana and works as a primary care doctor there [176-1 ¶ 6]. Mr. Robertson was under her care [*id.*]. He first arrived at ISP on December 30, 2021 from Indiana State Reformatory with a prior leg injury sustained at another facility [*id.* ¶ 10; 183-2 Tr. 7, 15-16]. In July 2021, before moving facilities, Mr. Robertson was examined and diagnosed with mild diffuse disc generation after complaining of

---

[1] The court thanks counsel for accepting appointment in ably representing Mr. Robertson.

pain and paresthesias (a burning, prickling sensation, similar to pins and needles) in his right leg [176-2 at 25]. Weeks later, scans revealed no acute fractures or tissue abnormalities [*id.* 26].

When Mr. Robertson arrived at ISP, Nurse Lacey Gorske determined he was "capable of performing activities of daily living" [*id.* 1]. His records note a "stabilized, permanent or chronic physical or medical condition" but confirm that he could perform self-care [*id.* 12]. On January 6, 2022, Mr. Robertson saw a nurse after falling twice and reporting a "10 out of 10" pain in his leg [183-2 Tr. 19]. The nurse contacted Dr. Marthakis, who prescribed a walker for six months and Tylenol for right knee pain and swelling [*id.* Tr. 20; 176-2 at 14-15, 17]. Dr. Marthakis first saw Mr. Robertson on January 11, 2022 [183-2. Tr. 19]. This visit began a lengthy course of treatment, trying to diagnose Mr. Robertson and treat his pain.

Dr. Marthakis ordered x-rays of his hip and knee for leg pain on January 11, 2022 [176-2 at 135]. She also provided a flag pass[2] and prescribed Cymbalta because Tylenol wasn't adequately addressing his pain [*id.* 139]. Shortly after, Mr. Robertson reported Cymbalta made him nauseous, so Dr. Marthakis prescribed extra-strength Tylenol instead [*id.* 145]. In early February, Dr. Marthakis referred Mr. Robertson to physical therapy for his leg and back injury, but he missed the first appointment due to a lockdown [*id.* 151, 155; 183-1 ¶ 9]. On February 18, Dr. Marthakis requested an orthopedics consultation since she hadn't seen anything remarkable on the x-rays, and Mr. Robertson continued to report being in pain despite medication [176-2 at 161]. This occurred after a letter from the American Civil Liberties Union (ACLU) on February 6, 2022 inquiring about an orthopedics consultation [183-3 at 1].

---

[2] A "flag pass" is a recommendation for a first-floor housing assignment so that a prisoner can avoid stairs, and it allows medical staff to alert prison officials that a prisoner "should be assigned to the first floor due to a medical issue" [176-1 ¶ 11]. Dr. Marthakis didn't control whether inmates actually received the first-floor housing assignment; that depended on availability of cells on the first floor [*id.*].

In March, Dr. Marthakis examined Mr. Robertson after he fell and injured his foot, and x-rays, crutches, and Toradol injections followed [176-2 at 171-72, 175]. The x-ray showed only arthritis [176-3 at 74]. Mr. Robertson requested a specialist visit with an orthopedist on March 23, 2022, apparently unaware that one had already been scheduled [183-13]. On March 27, Mr. Robertson had another steroid injection [176-2 at 180]. A few days later, he requested the renewal of his flag range pass, and Dr. Marthakis extended her support for 90 days in early April [176-3 at 168]. Mr. Robertson requested the extension again a couple of days later, after the extension had already been granted, and that was pointed out to him [*id.* 170].

On April 14, Mr. Robertson saw an outside orthopedic specialist, Dr. B. Israel Yahuaca of Lakeshore Bone & Joint Institute, who suggested Ibuprofen, Tylenol, Norco, and an MRI of the right knee and lumbar spine [*id.* 75]. Dr. Marthakis ordered the requested MRI that same day [176-2 at 184]. A nurse at ISP offered Mr. Robertson an injection for pain the day he returned from his orthopedic consultation, but he "became irate and argumentative" and refused the injection [*id.* 187]. Mr. Robertson instead requested Norco on April 14 [176-3 at 171-72].

On April 19, in response to his request, Mr. Robertson was seen by Nurse Practitioner Todd Wolford, and Mr. Robertson again requested Norco [176-2 at 190]. NP Wolford told him to rest, ice, and perform gentle exercises and address his pain with over-the-counter medication and Naproxen while awaiting MRI results [*id.* 190-92]. NP Wolford ordered these medications under observation (Direct Observation Therapy) and to be administered "crushed" [*id.*]. Dr. Marthakis didn't provide Norco because it is an opioid, which she believed was dangerous to prescribe to someone with Mr. Robertson's substance abuse history [176-1 ¶ 21]. She also

believed there were other ways to manage his pain [*id.*]. On April 26, Mr. Robertson didn't attend an appointment for his knee injection [176-2 at 193].

On May 4, Dr. Marthakis saw Mr. Robertson [*id.* 195]. She explained to him that narcotics weren't safe for someone with his substance abuse history,[3] and she offered a steroid knee injection to manage his pain [*id*]. She also noted that staff had observed Mr. Robertson walking normally without crutches or a cane but that Mr. Robertson seemed to walk with crutches when he knew medical staff was watching [*id.* 195]. On May 12, Mr. Robertson asked for his crutches to be renewed, and NP Wolford renewed the crutches [176-3 at 178; 176-2 at 203-04].

On May 16, Mr. Robertson had an MRI of his right leg and lumbar spine at Franciscan Health [176-2 at 336]. Dr. Marthakis ordered an orthopedic follow-up after the MRI on May 28 [*id.* 208-09]. In late May, Mr. Robertson requested Norco again, but Nurse Practitioner Diane Thews offered him other medication (Pamelor, which can be used for nerve pain) before continuing him on Naproxen [*id.* 213-215]. In early June, he received another steroid injection and crutches [*id.* 216]. He wrote that the steroid injections helped [176-3 at 184].

On June 10, Dr. Marthakis saw Mr. Robertson when he requested to be put on medical idle status [176-2 at 219]. He reported not getting much relief from the medication, but he told Dr. Marthakis that the injections provided some relief [*id.*]. Dr. Marthakis explained to him that he didn't qualify for medical idle status because he could still participate in some prison programming, but she renewed his flag pass and crutches for another three months [176-2 at 221; 176-1 ¶ 25]. She also prescribed him Pamelor, an antidepressant that can help with chronic pain

---

[3] Mr. Robertson says he never had a prescription drug abuse problem, but he acknowledges that he had past alcohol problems [183-1 ¶ 39-41]. Admirably, he has been clean and sober for over 15 years [*id.* ¶ 42].

[176-2 at 221; 176-1 ¶ 25]. On June 25, Mr. Robertson complained that Pamelor made him dizzy and blurred his vision [176-3 at 185].

On June 28, Mr. Robertson saw Dr. Yuhuaca for his orthopedic follow-up [176-2 at 225-28; 176-3 at 110-12]. Dr. Yuhuaca recommended a follow-up with a spine specialist or neurosurgeon, a steroid, and pain medication [176-3 at 112]. Mr. Robertson was given a steroid (Prednisone) that same day and an injection the next day [176-2 at 226, 230]. NP Wolford also referred him for a Neuro-Spine Clinic Specialty Office Visit on June 29, a day after Dr. Yuhuaca recommended it [*id.* 229].

On July 5, Dr. Marthakis met with Mr. Robertson to discuss the negative side effects he was experiencing from Pamelor [*id.* 302]. He said he didn't want to continue the medication because it was a "psych" medication, though Dr. Marthakis explained he had been prescribed it for pain [*id.*]. She stopped the Pamelor and started him on Depakote instead [*id.* 303]. Depakote is an anti-convulsant medication used for epilepsy, nerve pain, and bipolar disorder [176-1 ¶ 27]. Mr. Robertson wrote a healthcare request two days later expressing concern that Depakote was a mental health drug and complaining he didn't have any effective pain medication [176-3 at 191].

Dr. Marthakis then met with him on July 15, and Mr. Robertson refused to take any "psych" medications [176-2 at 234]. She started him on Dilantin instead [176-1 ¶ 28; 176-2 at 244]. Mr. Robertson then complained that the Dilantin wasn't working, his balance was "really off," and he experienced slurred speech [176-3 at 192]. Mr. Robertson also notes that he missed meals during this time because of the difficulty getting to the dining hall [183-9 (noting dining scan in times)].

On August 11, Mr. Robertson saw a neurosurgeon at IU Health, who diagnosed him with chronic lumbar radiculopathy [176-2 at 244-45]. Dr. Gordon Mao prescribed Gabapentin and recommended a referral to a pain clinic [176-3 at 125; 176-2 at 344]. Dr. Marthakis didn't prescribe Gabapentin (or Neurontin) because it was similar to previous medications Mr. Robertson hadn't liked and was heavily abused in the correctional setting [176-1 ¶ 29]. She ordered a pain clinic visit on August 12 [176-2 at 328-32]. In late August, Mr. Robertson saw NP Thews, who prescribed more Tylenol, renewed his flag and crutch passes, and noted he would be going to a pain clinic [*id.* 289-92].

The pain clinic at IU Health scheduled Mr. Robertson for an October appointment but then rescheduled it for December [*id.* 345]. While Mr. Robertson waited, Dr. Marthakis and NP Thews ordered more extra strength Tylenol, declined to prescribe Gabapentin because of its abuse potential, and renewed his flag and crutch passes [176-1 ¶ 31; 176-2 at 249-54]. When Mr. Robertson reported that the Tylenol wasn't helping in October, they ordered Prednisone, a steroid, and renewed his crutch pass [176-2 at 259-60]. In November, after a fall, he received an injection and had his crutch pass renewed again [*id.* 267-68].

On December 1, Mr. Robertson saw the pain specialist, who performed an epidural steroid injection [176-3 at 135-37]. Side effects resulted in an emergency room visit and a catheter [176-2 at 277-79, 282]. Nurse Practitioner Karne Fagan referred Mr. Robertson to a urologist and renewed his flag and crutch passes for another three months [*id.* 305-08].

On January 5, 2023, Mr. Robertson saw an offsite urologist for urine retention issues [*id.* 91]. A day later, Dr. Marthakis referred him for a cystoscopy because of his urinary issues and headaches [*id.* 36-38]. On January 17, Dr. Marthakis again saw Mr. Robertson, and she explained

that he would be going to an outside specialist for the cystoscopy and ordered a cane at his request [*id.* 52]. He saw a urologist on February 17 [*id.* 108].

Mr. Robertson returned to Dr. Marthakis on March 1, and he requested to have his cane and flag range housing pass renewed [176-3 at 255]. Dr. Marthakis offered to recommend his move from cellhouse C to cellhouse A, which would have placed him closer to medical, but Mr. Robertson declined [*id.* 257]. After seeing him walk with only a slight limp and observing him walk normally when he didn't know he was being observed, Dr. Marthakis recommended that he be placed on 200 or below housing without any assistive devices [*id.* 255]. That would have required only a single set of stairs [176-1 ¶ 38]. When she saw him again on March 10, he wanted refills of the extra-strength Tylenol, saying it had worked "somewhat," and had a stable gait, and Dr. Marthakis confirmed the active order of Tylenol [176-3 at 276-78].

In April 2023, Mr. Robertson received a cane and his flag range pass for another three months [176-2 at 104; 176-3 at 284-86]. He also went to IU Methodist Hospital for a lumbar epidural steroid injection [176-3 at 287-89]. Mr. Robertson's records document continuous treatment—his Tylenol was renewed in November 2023 per his request [*id.* 341], and as recently as January 8, 2024, Dr. Marthakis renewed his cane and flag passes [*id.* 342]. In April 2024, Mr. Robertson transferred to Plainfield Correctional Facility, thereby ending Dr. Marthakis' involvement in his medical care [176-1 ¶ 45].

STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury

could rely to find in his favor. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). The court must construe all facts in the light most favorable to the non-moving party, viewing all reasonable inferences in that party's favor, *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant summary judgment when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

DISCUSSION

Mr. Robertson asserts that Dr. Marthakis acted with deliberate indifference by denying adequate treatment and accommodations for his medical condition.[4] Under the Eighth Amendment, inmates are entitled to constitutionally adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to his medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so

---

[4] Mr. Robertson's briefing references "retaliation" multiple times, and it seemingly influences his argument. The court didn't permit Mr. Robertson to proceed on his First Amendment retaliation claim in this case. Any facts related to retaliation are material only insofar as they address Dr. Marthakis' deliberate indifference in allegedly delaying or denying care.

obvious that even a lay person would easily recognize the necessity for a doctor's attention, and if untreated could result in further significant injury or unnecessary pain, and that significantly affects the person's daily activities or features chronic and substantial pain. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

Deliberate indifference is a high standard and is "something approaching a total unconcern for [a prisoner's] welfare in the face of serious risks," or a "conscious, culpable refusal to prevent harm." *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992). "[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though [s]he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (quotations omitted). For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, she must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008).

A prisoner is not entitled to demand specific care, nor is he entitled to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). The law explains:

> [M]edical professionals are not required to provide "proper" medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards. There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances.

*Jackson*, 541 F.3d at 697-98 (quotations and citations omitted). When a medical professional has provided some level of care for a prisoner's medical condition, to establish deliberate indifference the prisoner must show that "the defendants' responses to [his condition] were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Synder*, 546 F.3d 516, 524 (7th Cir. 2008). Negligence, incompetence, or even medical malpractice do not amount to deliberate indifference. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004); *Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000). And a mere disagreement with medical professionals about appropriate treatment does not amount to an Eighth Amendment violation either. *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).

A. *Procedural Issues.*

Before addressing the merits, the court takes up several preliminary matters. Dr. Marthakis, before replying to the substance of Mr. Robertson's response, raises procedural and evidentiary problems. First, Mr. Robertson's response fails to comply with Local Rule 56-1, which requires a response to the movant's statement of material facts. N.D. Ind. L.R. 56-1(b)(2). Mr. Robertson's counsel acknowledges that he failed to comply with this requirement, though he assures the court that his 45-page response containing his own statement of facts and his brief were filed in good faith, and he asks the court either to allow him to file a third version of his response or excuse him from the rule.

"[I]t is the function of a court, with or without a motion to strike, to review carefully both statements of material facts and statements of genuine issues and the headings contained therein and to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record offered in support of the statement." *Mayes v. City of*

10

*Hammond*, 442 F. Supp.2d 587, 596 (N.D. Ind. 2006). Expectations are clear. *See also* Fed. R. Civ. P. 56(c)(1)(A) (parties must "cit[e] to particular parts of materials in the record"); N.D. Ind. L.R. 56-1(b)(2) (party must include "a citation to evidence supporting each dispute of fact"). The court will not scour the record without a suitable proffer. *See Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1017 (7th Cir. 2016); *Waldridge*, 24 F.3d at 923-24; *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Compliance with these rules demonstrates respect for the process, and it facilitates efficient rulings for the parties, something that proves more difficult when the court is left trying to make sense of a lengthy record without that aid.

Accordingly, the court deems admitted all facts in the defense's statement of material facts that have not been disputed by a response or citations to evidence under Local Rule 56-1(b)(2) or with particularity under Local Rule 56-1(b)(2). Given multiple extensions, permission to file an amended response already, impending trial date, and the relatively straightforward claims, the court proceeds on the record as it stands, with uncontested facts admitted. Mr. Robertson should not be concerned because his briefing otherwise includes his own statement of material facts and thoroughly addresses the arguments.

Second, Dr. Marthakis argues the court should strike certain affidavits from the record. "Motions to strike are heavily disfavored, and usually [are] only granted in circumstances [when] the contested evidence causes prejudice to the moving party." *Rodgers v. Gary Cmty. Sch. Corp.*, 167 F. Supp.3d 940, 948 (N.D. Ind. 2016). The two affidavits from Anthony Welkie [183-5] and Jim Craig [183-14] recount the experiences of other prisoners with alleged delays in care from Dr. Marthakis. Neither affidavit mentions Mr. Robertson at all; in fact, the only similarity seems to be that each prisoner alleges that Dr. Marthakis delayed his own care. Dr. Marthakis argues that

these affidavits don't bear on whether she was deliberately indifferent to Mr. Robertson's individual case, particularly without any underlying *Monell* pattern or practice claim or any class claim. Neither declarant claims to have any firsthand knowledge of what occurred here. Fed. R. Evid. 401, 403, 701(a). The court thus won't consider these affidavits in determining whether genuine issues of "material" fact exist. Fed. R. Civ. P. 56(a).

Dr. Marthakis also asks the court to strike Mark Vasilopulos' affidavit because, she argues, it is irrelevant and contains hearsay [183-8]. Affidavits and exhibits submitted to support or oppose a summary judgment motion must be based on personal knowledge and set forth facts that would be admissible in evidence. Fed. R. Civ. P. 56(e); *see, e.g.*, *Drake v. Minn. Min. & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998). If evidence offered at summary judgment is inadmissible hearsay, the court may not consider it. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985). Mr. Vasilopulos' affidavit recounts being housed with Mr. Robertson, assisting him with meals, and listening to him complain about his pain and what his medical providers told him [183-8]. Mr. Robertson argues that Mr. Vasilopulos offers firsthand observations of his physical condition—and that much is true and not hearsay—and Mr. Robertson notes that hearsay exceptions may apply at trial to the statements. For example, he explains that the statements may not be offered for the truth of the matter asserted.

The parties overcomplicate this a bit, but, to cut to the chase, the court doesn't find that Mr. Vasilopulos' affidavit bears on whether a reasonable jury could find that Dr. Marthakis was deliberately indifferent to Mr. Robertson's medical needs. The information he provides, to the extent admissible, focuses on Mr. Robertson's pain and suffering, which may bear on damages, and which might bear on whether he had an objectively serious medical need, *see Farmer*, 511 U.S.

at 834; *Greeno*, 414 F.3d at 653, but he has no firsthand knowledge of Mr. Robertson's treatment. He recounts only what Mr. Robertson told him Dr. Marthakis said about Mr. Robertson's transfer request. He cannot speak, with personal knowledge, about the actions taken or not taken by Dr. Marthakis or Mr. Robertson's diagnoses or course of treatment. He can only repeat what Mr. Robertson told him, and that isn't admissible. *Cairel*, 821 F.3d at 830. The court disregards this affidavit to the extent it relies on inadmissible hearsay or facts outside Mr. Vasilopulos' personal knowledge.

Third, Dr. Marthakis spends over five pages asking the court to pick apart Mr. Robertson's affidavit paragraph by paragraph, faulting Mr. Robertson for being too broad, making statements outside his personal knowledge (including hearsay), making statements he lacks the qualifications to make (including undisclosed medical opinions), and making statements that directly contradict the medical records and his admission about these medical records.[5] For his part, Mr. Robertson had no business submitting an affidavit filled with plainly inadmissible statements. Dr. Marthakis classifies her points as evidentiary objections, but they largely read as arguments why Mr. Robertson hasn't presented the necessary evidence to create a genuine triable issue. Thus understood, the court addresses these arguments as necessary when ruling on the merits rather than accepting Dr. Marthakis' invitation to redline the affidavit. *See Clemons v. Wexford Health Sources, Inc.*, 106 F.4th 628, 635 (7th Cir. 2024) (district court did not err in considering affidavit building on facts already in evidence).

---

[5] Mr. Robertson alleges that he suffered a broken toe [183-1 ¶ 22], but he concedes the x-ray showed no such fracture [177 ¶ 30]. And without contest to this fact, the court already has deemed it admitted. N.D. Ind. L.R. 56-1(b)(2).

B. *Delay on Referral to Outside Specialists*.

Mr. Robertson first claims that Dr. Marthakis acted with deliberate indifference by delaying his referral to outside specialists. Failing to refer a prisoner to a specialist may constitute deliberate indifference if the physician instead continues an ineffective course of treatment. *Greeno*, 414 F.3d at 655 (physician denied referral for a year and a half and banned referral). But specialty care isn't required under the Constitution. "Like other medical decisions, the choice whether to refer a prisoner to a specialist involves the exercise of medical discretion," and a claim for deliberate indifference only survives if the "choice is blatantly inappropriate." *Clemons*, 106 F.4th at 636. Cost-saving rationales for delaying care don't "transform [the] exercise of reasonable medical judgment into deliberate indifference." *Id.* at 637. Mr. Robertson says Dr. Marthakis delayed a referral, but the record fails to offer a basis for a reasonable jury to draw this same conclusion.

Mr. Robertson claims delays occurred between a fall and an MRI and between a spinal consult request and the appointment. Specifically, he says he didn't see an orthopedic specialist until April 14, 2022, and he didn't see a spine specialist until August 11, 2022. He claims this delay equated to dismissing him and denying him care. Dr. Marthakis says no reasonable jury could look at her course of treatment and find it deliberately indifferent.

Dr. Marthakis saw Mr. Robertson for the first time on January 11, 2022, just days after learning about his complaints [183-2 Tr. 19]. From there, she ordered x-rays, which didn't show anything emergent [176-2 at 162]. She ordered pain medication, and, a little over a month later, she ordered a consultation with an orthopedic specialist [*id.* 161-62]. That visit happened in April [176-3 at 75]. Specialist visits take time, and unfortunately, a couple of months isn't an unusual

14

delay, either in or out of custody. It certainly isn't deliberately indifferent, particularly when referring doctors, like Dr. Marthakis, don't control the schedule of outside specialists [176-1 ¶ 17]. She explains that when she refers a patient, her staff then tries to find local specialists and get the first available appointment [*id.*]. Nothing on this record would allow a reasonable jury to conclude that normal process wasn't followed or that Dr. Marthakis deliberately disregarded any urgency.

At the April 2022 appointment, the specialist requested an MRI, and Dr. Marthakis ordered it immediately; the imaging occurred a month later [176-2 at 184]. Another specialist appointment happened roughly six weeks after the MRI results [*id.* at 225-28]. The next day, Dr. Marthakis' colleague referred Mr. Robertson to a neurosurgeon, and that appointment happened on August 11, 2022, six weeks after the referral [*id.* 229, 244-45]. The neurosurgeon recommended a referral to a pain clinic, and Dr. Marthakis referred Mr. Robertson the next day [*id.* 328-32]. After some scheduling, Mr. Robertson's initial October appointment was moved to December 1, 2022, meaning he waited about three and a half months [*id.* 345].

Nothing on this record points to dismissal or delay. Dr. Marthakis repeatedly referred Mr. Robertson to outside specialists almost immediately as she tried to manage his condition. And, as she points out, she had little to no control over when specialists could see Mr. Robertson. Mr. Robertson refers the court to Dr. Mao's statement in August 2022 that he should have been seen a year earlier [183-1 ¶ 17],[6] but Dr. Marthakis hadn't even been treating Mr. Robertson for a year at that point, and no reasonable jury could blame her for not treating Mr. Robertson when he wasn't her patient. Any modest delay may have been frustrating, but Mr. Robertson points to no

---

[6] Mr. Robertson doesn't provide any basis for this statement to be rendered admissible, nor does he provide any affidavit, statement, or opinion from Dr. Mao. The court cannot rely on inadmissible hearsay to deny summary judgment. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely on inadmissible hearsay to oppose a motion for summary judgment.").

evidence for a reasonable jury to find that the timing attributed to Dr. Marthakis—her conduct and course of treatment within her control—reflected deliberate indifference to his pain. These weren't delays in her referrals, only available appointments.

C. *Pain Management.*

Mr. Robertson's complaint about pain management mostly focuses on Dr. Marthakis' refusal to provide Norco, a drug initially recommended by the orthopedic specialist [176-2 at 189-90]. Dr. Marthakis claims that her pain management decisions were based on her medical judgment, particularly in light of the nationwide opioid epidemic [176-1 ¶ 21].

Mr. Robertson has no constitutional right to demand a certain course of treatment. *Forbes*, 112 F.3d at 267. Physicians are entitled to "choose from a range of acceptable courses based on prevailing standards in the field." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (quotations omitted). "Where the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the situation differently." *Clemons*, 106 F.4th at 635 (quotations omitted). Decisions that "may be characterized as classic examples of matters for medical judgment, such as whether one course of treatment is preferable to another" aren't within the Eighth Amendment's purview. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996) (quotations and citations omitted). Additionally, "[e]vidence that the defendant responded reasonably" to the risk of harm, even if "ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference." *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022).

Dr. Yahuaca, an orthopedist at the Lakeshore Bone & Joint Institute, prescribed Norco to Mr. Robertson as needed for severe pain, along with Ibuprofen and Tylenol, on April 14, 2022,

and the prescription was voided [176-3 at 75, 125]. Mr. Robertson inquired about Norco in May 2022; but, based on his substance abuse history, Dr. Marthakis recommended a knee intra-articular joint injection instead [176-2 at 195]. She testified that it "is very dangerous to prescribe an opioid pain medication to someone with a substance abuse history" [176-1 ¶ 21]. This was a medical judgment, and no reasonable jury could find it was a radical departure from professional standards. *Clemons*, 106 F.4th at 635-36. She explained this to Mr. Robertson and performed a steroid injection instead [176-1 ¶ 23].

In June 2022, Mr. Robertson reported that the Mobic, Naproxen, and Tylenol he was on weren't working well and said Cymbalta was upsetting his stomach; he again wanted Norco [176-2 at 213]. Mr. Robertson had another visit with Dr. Yahuaca on June 28, 2022, and Dr. Yahuaca recommended referral to a specialist, a Medrol Dosepak (a steroid), and "pain medication" (not Norco specifically) to help alleviate discomfort until Mr. Robertson could see a neurosurgeon or orthopedic spine specialist [*id.* 334-35]. Dr. Marthakis followed Dr. Yahuaca's recommendation and ordered Prednisone (a steroid) and a shot of Toradol [176-1 ¶ 26]. Choosing a different path than Mr. Robertson wanted isn't deliberate indifference so long as it isn't a substantial departure from professional judgment. *Jackson*, 541 F.3d at 697. Dr. Yahuaca recommended a steroid, and Dr. Marthakis prescribed one. No reasonable jury could conclude this was a substantial departure from professional judgment.

Mr. Robertson also requested Gabapentin after it was recommended by the neurosurgeon [176-3 at 125]. Dr. Marthakis noted that Gabapentin (Neurotin) is similar to the Depakote and Dilantin she had previously prescribed for Mr. Robertson that he didn't like or weren't effective [176-1 ¶ 28-29]. The drug is also "heavily-abused and trafficked" in prison settings, so she did

not think it would be a good choice for Mr. Robertson [*id.* ¶ 29; 176-2 at 291 ("serious safety concerns for putting patient on Neurontin with substance abuse history")]. After consulting with a nurse practitioner, and being concerned about the potential for abuse, she agreed to prescribe extra-strength Tylenol while Mr. Robertson waited to get into the pain clinic for which she had made a referral [176-1 ¶ 31]. She ordered more Prednisone in October 2022 after Mr. Robertson said the extra-strength Tylenol wasn't working [*id.* ¶ 32]. Dr. Marthakis explained "[p]rescribing controlled substances for pain management is not recommended for patients who have a history of substance abuse" and "should only be given as an absolute last resort for debilitating levels of pain when other medications have proven to be ineffective" [*id.* ¶ 46].

Physicians aren't deliberately indifferent when they adjust medication to help address pain, even if they aren't successful. *See Cox v. Brubaker*, 558 F. Appx. 677, 679 (7th Cir. 2014). Mr. Robertson wasn't entitled to demand specific care or medications, and nothing would suggest to a reasonable jury that Dr. Marthakis was ignoring his needs. *Forbes*, 112 F.3d at 267.

Mr. Robertson's most troubling allegation is that he went without pain medication for 21 days. But the medical records Mr. Robertson cites don't reflect that. Instead, they show that he continued to receive acetaminophen (the active ingredient in Tylenol) twice a day in August [176-3 at 607]. Mr. Robertson acknowledges that he received Tylenol; he just questioned its efficacy [183-1 ¶ 27]. The record shows that Mr. Robertson continued to receive medication, and he provides no evidence for a reasonable jury to find a period where he wasn't receiving any pain medication. The record shows experimentation with medications as Dr. Marthakis and other ISP providers tried to treat Mr. Robertson or adjust his treatment, but no reasonable jury could conclude that Dr. Marthakis didn't act reasonably here by continuing to adjust Mr. Robertson's

medications based on his concerns. *See Rasho*, 22 F.4th at 710.[7] The court thus grants summary judgment for Dr. Marthakis on this claim.

D. *Medical Accommodations.*

Mr. Robertson raises multiple instances of a failure to provide accommodations. First, he says he wasn't housed in the infirmary, or G-dorm, and didn't have meals sent to his dorm. Second, he claims that Dr. Marthakis tried to reassign him to the fifth range of A-cellhouse, which he said he refused because he couldn't navigate the necessary stairs. As an initial matter, Dr. Marthakis confirms that she offered to have Mr. Robertson moved to A dorm, but she clarifies that while she can recommend that prisoners be moved to A dorm as a physician, she cannot dictate to prison administration that anyone be housed on a floor other than the first floor [192-1 ¶ 2-3]. In other words, she couldn't recommend someone be housed on the fifth range (floor), where Mr. Robertson claims she recommended he be housed [*id.*].

To succeed on a claim for failure to provide accommodations against Dr. Marthakis, Mr. Robertson must provide some evidence showing that she was personally involved in the alleged constitutional violation, denying him accommodations. *Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019). He hasn't. Mr. Robertson argues that a jury needs to decide whether Dr. Marthakis' testimony that he didn't need the housing or meals sent to his dorm is reliable, but he cannot succeed on a claim against her for a decision outside her authority or a decision that someone else made. His affidavit's speculation alone isn't enough to establish an issue of material fact for

---

[7] Mr. Robertson's affidavit recounts Dr. Mao, the neurosurgeon, informed him that he "was not receiving the appropriate medications or medical care under Dr. Marthakis' supervision" [183-1 ¶ 26]. But he again provides no basis for this statement to be admitted as evidence, nor does he provide any direct statements or opinions from Dr. Mao, and the court cannot rely on inadmissible hearsay or reiterated medical opinion to deny summary judgment. *See Gunville*, 583 F.3d at 985.

trial. *Consolino v. Towne*, 872 F.3d 825, 830 (7th Cir. 2017) ("The affidavit presents nothing more than sheer speculation, and speculation is not enough to create a genuine issue of fact for the purposes of summary judgment").

Dr. Marthakis adds that, at nearly all times, Mr. Robertson was prescribed a cane or walker and there is no evidence that he couldn't walk. She adds that ISP doesn't have a traditional infirmary, and Mr. Robertson was housed in G-dorm at times, the closest dorm to the medical unit [176-1 ¶ 53]. Additionally, she says that he didn't qualify for a medical lay-in, which would have allowed him to receive his meals in his cell because that is for patients who truly couldn't walk, and she believed walking was good for Mr. Robertson's condition [*id.*]. At one point in March 2023, she also offered to move him from C-cellhouse to A-cellhouse, which would have been closer to medical and other prison services [*id.* ¶ 38]. This didn't occur, Mr. Robertson says, because another prison staff member denied it on his behalf [183-1 ¶ 31]. Dr. Marthakis finally notes that she provided crutches, a cane, walker, and a flag range pass, so no reasonable jury could conclude that she was deliberately indifferent or failed to accommodate Mr. Robertson's medical needs.

Mr. Robertson claims that Dr. Marthakis revoked his cane and flag pass in March 2023 [*id.* ¶ 30]. He says she explicitly said she was doing this because of his involvement in litigation and because of his requests for additional medical accommodations [*id.* ¶ 29]. Dr. Marthakis responds she did this because she had heard from officers he was walking without assistance and had personally witnessed him walk without limping [176-1 ¶ 38]. There may be a factual dispute about whether Mr. Robertson could in fact walk well without his cane, but he can't show that Dr. Marthakis was deliberately indifferent to his needs, even drawing all inferences in his favor,

because she still provided a medical order, even in March 2023, for him to be assigned to a 200 or below range to avoid stairs [*id.*]. She saw him 10 days later and noted a stable gait, refilled his Tylenol prescription, and referred him to the pain clinic for another visit [*id.* ¶ 39]. Nothing Mr. Robertson points to would allow a reasonable jury to conclude that she knew of a risk of serious harm and did nothing; she was still taking steps to provide accommodations. *Board,* 394 F.3d at 478. And she renewed his cane a month later after a specialist recommended it [176-1 ¶ 40-41]. No reasonable jury could conclude that she failed to provide Mr. Robertson with medical accommodations, so the court grants summary judgment for Dr. Marthakis on this claim.

E. *Informed Consent.*

Mr. Robertson's last claim alleges that Dr. Marthakis didn't disclose the side effects of Dilantin and didn't tell Mr. Robertson that he could refuse the medication before prescribing it in August 2022 [176-2 at 244 (prescription for 100mg capsule)]. On August 23, 2022, Mr. Robertson reported that Dilantin wasn't helping, and he was experiencing balance problems and slurred speech [*id.* 289]. The medical records show Tylenol was then ordered at 500 mg for 30 days [*id.* 291].

Courts use a two-step inquiry to determine whether a prisoner's right to informed consent has been violated. *Knight v. Grossman,* 942 F.3d 336, 343 (7th Cir. 2019). First, Mr. Robertson must provide evidence for a reasonable jury to conclude that "(1) he was deprived of information that a reasonable patient would deem necessary to make an informed decision about his medical treatment, (2) the defendant acted with deliberate indifference to the prisoner's right to refuse treatment, and (3) if the prisoner had received the information, he would have refused the treatment." *Id.* at 344. If he provides evidence for a reasonable jury to conclude that his right to

informed consent was violated, the court then "take[s] the second and final step of balancing the prisoner's right to informed consent against countervailing state interests." *Id.* The defendant is only liable if "in the end, the prisoner's right outweighs the state interests." *Id.* "[P]risoners have no right to be informed of insubstantial risks; otherwise, after receiving appropriate treatment that proved to have unpleasant side effects, a prisoner might claim that he had not received sufficient information to allow him to decide whether to refuse that treatment." *Cox*, 558 F. Appx. at 679 (quotations and citation omitted).

Dr. Marthakis says she prescribed Dilantin as an alternative after other pain medications didn't work and explains that the drug "is an anti-seizure medication that can also be effective at controlling pain, specifically nerve pain" [176-1 ¶ 28]. The side effects were "not more severe or more likely than any other medication [she] would prescribe for chronic pain" [*id.*]. Mr. Robertson says she never told him of the primary purpose or warned him about side effects, which included dizziness, loss of balance, and slurred speech [183-1 ¶ 46-47]. The medical records show that he was taken off Dilantin and put on extra strength Tylenol, two tablets every 12 hours on August 23, 2022, less than two weeks after he started the medication [176-2 at 292].

Mr. Robertson hasn't testified that he would not have taken Dilantin had he known about the side effects; in fact, he lists that as a factual question the jury must decide [188 at 24 ("Would Mr. Robertson have refused Dilantin if he had been properly informed about its purpose, risks, and alternatives?")]. This failure to provide evidence that he would have refused the medication had he been properly informed is enough to doom his claim. *Knight*, 942 F.3d at 344.

But even if he had provided testimony to that effect, he hasn't provided evidence for a reasonable jury to conclude that Dilantin posed a risk of side effects that went beyond

unpleasantness. He says Dr. Marthakis didn't tell him the primary use of the Dilantin and didn't warn him about any potential side effects, but he doesn't have a right to be informed about insubstantial risks. *Cox,* 558 F. Appx. at 678-79 (risks of fast heart rate, urinary retention, dry mouth, anxiety, hallucinations, weight gain or loss, and low blood pressure weren't side effects a rational jury could conclude required disclosure). He hasn't provided any grounds for a reasonable jury to conclude that Dr. Marthakis acted with anything beyond negligence, if that, and that would not be sufficient. *See Knight*, 942 F.3d at 343 (negligence or even gross negligence not sufficient). No reasonable jury could conclude that Dr. Marthakis violated his right to informed consent.

CONCLUSION

Accordingly, the court GRANTS Dr. Marthakis' summary judgment motion [176], GRANTS her motion to file a reply exceeding the page limit [191], and DENIES Mr. Robertson's motion to file an amended statement of facts [194]. This order terminates the case.

SO ORDERED.

June 25, 2025                         *s/ Damon R. Leichty*
                                     Judge, United States District Court